Ivo P. JANECKA, Individually and as Representative of the Estate of MARY ANN JANECKA, Deceased, Respondent-Appellant, v CARYL CASEY et al., Appellants-Respondents.

First Department, December 4, 1986

**APPEARANCES OF COUNSEL**

*Bruce M. Young* of counsel *(Kanterman, Taub & Breitner, P. C.,* attorneys), for respondent-appellant.

*Michael I. Josephs* of counsel *(Garbarini, Scher & DeCicco, P. C.,* attorneys), for appellants-respondents other than Gracie Square Hospital.

**OPINION OF THE COURT**

SULLIVAN, J.

The deceased committed suicide on December 18, 1983, just two months after her October 21, 1983 discharge from Gracie Square Hospital, where she had been confined for 16 days for psychiatric observation. Alleging professional malpractice against the hospital and the doctors who treated her during her stay there, her estranged husband has brought this action for wrongful death and pain and suffering.

Gracie's records indicate that on October 6, 1983 the deceased, unescorted by family or friends, had admitted herself, stating that she felt abandoned and neglected ever since her husband had, two years earlier, commenced an action for divorce and custody of their three children. The hospital record also noted: "Although the patient has been in OPD treatment for the last one and a half years, the stress of [a] teaching job and living in a hostile and emotionally painful situation has become overwhelming for her." Fifteen years earlier, in 1968, the deceased had been afflicted with postpartum depression and treated successfully. Until the instant episode, she had not experienced any recurrence over the intervening years.

After joinder of issue, the defendant doctors collectively and Gracie each served a notice of discovery and inspection seeking the name and address of the attorney representing plaintiff in his divorce proceeding against the deceased; the index

number of said proceeding; and copies of all pleadings filed therein.

Citing Domestic Relations Law § 235,* which prohibits, except by order of the court, public inspection of, *inter alia,* the filed pleadings and testimony in a matrimonial action, plaintiff thereupon moved for a protective order vacating the notice. Plaintiff also argued that the pleadings were privileged since attorney-client communications were necessarily incorporated therein and that, in any event, the information sought was beyond the scope of discovery since it was neither material nor necessary to the defense of the action. Special Term granted the motion to the extent of striking the demand for the matrimonial action pleadings, finding that their materiality and necessity had not been shown so as to except them from the protection of Domestic Relations Law § 235. Special Term did, however, leave the other two demands intact. Defendants appeal from the grant of a protective order striking the third demand. Plaintiff cross-appeals from the denial of his motion as to the first two demands. We modify to deny plaintiff's motion in toto.

The purpose for which Domestic Relations Law § 235 was intended—the protection of the privacy of the parties to a matrimonial action *(Shiles v News Syndicate Co.,* 27 NY2d 9, 14)—is not thwarted by the discovery sought here since plaintiff, by claiming future economic loss by reason of the wrongful death of his wife, has invited scrutiny into his marriage. In a wrongful death action "[i]t is always proper to [t]ake proof of the relations of the decedent to the person for whose benefit the action is maintained" since "the amount recoverable in any particular case must be very largely influenced by the nature of [that] relationship" *(Loetsch v New York City Omnibus Corp.,* 291 NY 308, 310).

In such cases, evidence otherwise privileged is admissible if relevant. In *Freeman v Corbin Ave. Bus Co.* (60 AD2d 824),

---

* Domestic Relations Law § 235 (1) provides: "An officer of the court with whom the proceedings in a matrimonial action or a written agreement of separation or an action or proceeding for custody, visitation or maintenance of a child are filed, or before whom the testimony is taken, or his clerk, either before or after the termination of the suit, shall not permit a copy of any of the pleadings, affidavits, findings of fact, conclusions of law, judgment of dissolution, written agreement of separation or memorandum thereof, or testimony, or any examination or perusal thereof, to be taken by any other person than a party, or the attorney or counsel of a party, except by order of the court."

this court upheld a trial court determination that confidential court, hospital and social service records were relevant in a wrongful death action to show that the spouses were living separately and had a history of violence, and that the decedent had not contributed to the household support in the three years prior to his death. As we noted (p 825), citing *Wilkinson v Boehm* (231 App Div 295, 296), "in a wrongful death action the jury is 'entitled to know the amount the deceased earned, his habits, the relations existing between the wife and him and the position he has taken in respect to his obligations to support her' ". In response to the assertion of privilege, we held: "To the extent that some of [these records] may have been privileged, that privilege was waived by the plaintiff bringing this action, thus putting in issue the pecuniary loss suffered by next of kin and thus the evidentiary matter to which we have referred". *(Freeman v Corbin Ave. Bus Co., supra,* at p 825.)

In *Prink v Rockefeller Center* (48 NY2d 309), a wrongful death action in which the circumstances of the decedent's death were consistent with either negligence, as the plaintiff claimed, or suicide, as the defendant claimed, the plaintiff, during her examination before trial, admitted that the decedent, her husband, had told her that he was seeing a psychiatrist, but refused to disclose, on the basis of the spousal privilege, the content of that communication or, on the basis of the physician-patient privilege, her conversation with the psychiatrist after her husband's death. The court rejected the claim of privilege, holding that neither the physician-patient nor conjugal privilege would permit a plaintiff to "claim affirmative relief and at the same time refuse to disclose information bearing upon his right to maintain his action" *(supra,* at p 316). In disallowing the spousal immunity claim, the court quoted McCormick, Evidence (§ 86, at 173 [2d ed]):

" '[W]hile the danger of injustice from suppression of relevant proof is clear and certain, the probable benefits of the rule of privilege in encouraging marital confidences and wedded harmony, is at best doubtful and marginal.

" 'Probably the policy of encouraging confidences is not the prime influence in creating and maintaining the privilege. It is really a much more natural and less devious matter. It is a matter of emotion and sentiment. All of us have a feeling of indelicacy and want of decorum in prying into the secrets of husband and wife. It is important to recognize that this is the real source of the privilege. When we do, we realize at once

that this motive of delicacy, while worthy and desirable, will not stand in the balance with the need for disclosure in court of the facts upon which a man's life, liberty, or estate may depend' " *(supra,* at pp 317-318).

Thus, given the relevancy of the relationship between the deceased and the spouse who claims pecuniary loss due to her death, and the obvious significance of the court file in the spouse's matrimonial action on that issue, sufficient has been shown to warrant the disclosure of information otherwise privileged by virtue of the marital relationship. In such circumstances, the shield afforded by Domestic Relations Law § 235 must give way to the need for disclosure of relevant evidence.

Moreover, even on the question of liability a sufficient nexus exists between the divorce proceedings and the deceased's suicide to justify disclosure of the matrimonial file. Gracie's hospital records contain several references by the deceased to her husband's divorce action and her relationship with him and their children:

"The patient who returned to teaching three years ago said that the divorce was totally unexpected on her part. She feels discarded and abandoned by her husband and children, ages 15, 13, and 12, who want to remain with their father * * *

"Patient has no living family other than her husband and children who she feels are unsupportive * * *

"Patient admitted [with a chief complaint of] depression precipitated by husband's requesting divorce and taking action for same. States husband and children are very hostile to her."

The hospital records further disclose that although the deceased had been treated for postpartum depression at Gracie Hospital in 1968, her treatment was successful without any recurrence until the onset of a depression at the time of the commencement of the divorce action, two years earlier. Despite the pendency of that action, she had continued to live at home with her husband and children. Although depressed and extremely agitated at the time of her October 1983 admission, she had, as in 1968, shown improvement as a result of her hospitalization. She was "cheerful, outgoing, sleeping * * * and eating well" at the time of her discharge. Inexplicably, however, within two months after her return home and just prior to the scheduled execution of a divorce settlement, she committed suicide.

From the foregoing, defendants argue, it is readily apparent that the deceased's home environment, both before and after her October 1983 hospitalization, was counterproductive to the treatment which they rendered. Thus, they contend, their treatment cannot be viewed as the sole cause of the deceased's suicide. Even if it had been flawless, they argue, their treatment and its benefits may have been completely counteracted by plaintiff's conduct toward the deceased during the two-month period following her discharge. Thus, in any inquiry into the question of whether and to what extent plaintiff's actions aggravated and caused a resurgence of the deceased's condition, the pleadings in the matrimonial action become relevant. The manner in which plaintiff pursued his divorce proceeding, the grounds he alleged, the claims he made against the deceased, the actions he took against her, the defenses she claimed, and the counterclaims, if any, interposed would be germane to that issue and, as such, are material and necessary to the defense of the action.

Accordingly, the order of the Supreme Court, Bronx County (Barry Salman, J.), entered June 24, 1985, granting plaintiff's motion for a protective order to the extent of striking demand No. 3 from defendants' notice of discovery and inspection, should be modified, on the law, to deny the motion in its entirety and, except as thus modified, affirmed, without costs or disbursements.

SANDLER, J. P., FEIN, MILONAS and WALLACH, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about June 24, 1985, unanimously modified, on the law, to deny the motion in its entirety and, except as thus modified, affirmed, without costs and without disbursements. The cross appeal by plaintiff from said order is dismissed as deemed abandoned.